Illinois has reconvened. Thank you. Good morning. Please be seated. This case is number 4160185 in the matter of the Estate of Knowles for the appellate Frederick Roth and for the appellate Gregory Ray. Mr. Roth, you may proceed. Justices, staff, folks in council and members of the audience, my name is Fred Roth and this case is before you and it kind of concerns the word misleading.  The jury in this case was given a limiting instruction for all testimony of Frank Weber, the attorney who spent many hours working with Clyde Knowles on his wills. And the limiting instruction was incorrect. But the court, council, were not able to agree upon that. In fact, still don't agree. But the correct instruction would have been that there was no limiting instruction with respect to what Frank Weber testified to while he was on the stand regarding his conversations with the deceit in the planning of the revocation of wills. Was the correct limiting instruction ever tendered to the court? There was no limiting instruction that should have ever been given with regard to Well, the one to correct the original instruction to the jury, that was apparently incorrect because of the lack of discovery of the particular evidentiary provision that was implied. Right. On the first day, the court was persuaded to give a limiting instruction. On the second day, we pointed out that was incorrect and the judge specifically asked, are you asking me to correct the instruction to the jury that the one given on day one was incorrect? And my answer was yes. We need to do that. And the court refused to correct the mistake on the first day by informing the jury that the limiting instruction on the first day should not have been given because it did not apply. The court refused it or the court said we will wait and see what the testimony is and then, if it's needed, I thought the suggestion was that counsel would approach the bench or send something to the court to say, now let's correct that initial erroneous limiting instruction. I asked the judge to give correction prior to the second day's testimony specifically. And as I put it into the brief, at first, he's the one who suggested, well, I guess we have to go back and tell the jury not to apply the limiting instruction that they applied on day one. And I said, I think so. He said, well, I'm not asking if you think so. Are you asking me to give the corrective instruction or not? And I said, I'm asking you to give the corrective instruction. He says, okay. And then he refused to give it. He didn't say, we'll wait and see how the second day goes and then decide if I need to go back. The mistake had occurred. The mistake had occurred on the most important witness we Well, when Weber was recalled and testified to the additional matters, was it brought to the court's attention now that he has testified and we can see it goes beyond state of mind and the rule of evidence applies? Was the court then asked to On the new testimony, there was objections made because counsel took the position in opposition that even with this rule 8033, it did not apply and that he still made all his objections to the additional testimony that had been barred the day before. There was not a second request to the court. I don't believe a second request was required. The additional testimony was to cover matters that had been sustained in objections on the first day in total. There hadn't been any testimony. So it was supplementing where the testimony had been barred and there had been an offer of proof on the first day. I brought the witness back to give the live testimony on the part that had been in the offer of proof. But the court did not then instruct the jury with regard to the first day's testimony. It was never corrected by the court. The court acknowledged it was a mistake before the second day, acknowledged that I was going to go into areas that had been sustained in objections on the first day and specifically said, we will not rehash what you went over before. And I didn't rehash anything that had gone on on the first day. Counsel, do you think it would be possible since the jury was instructed as to the first day's testimony that they would consider the evidence as to state of mind but not so instructed the second day that the jury would have considered that second day testimony as substantive evidence? That's what I'm saying. The second day there's no instruction. It's just Webber's foot back on the stand and new testimony elicited. Right. It didn't correct the first day. By adding the additional testimony with repeated objections, adding the new testimony was adding the new testimony. It didn't correct what had happened the first day. It didn't correct the first impression. There was one chance to make the first impression it hadn't been corrected. And the problem is the court knew it hadn't been corrected, knew a mistake was made, and from the tenor in the courtroom was clearly not happy that the mistake had occurred. But that's not the excuse for not correcting it with the jury. I mean, we don't just let mistakes continue. I realize we're not looking for perfect trials, but a fair trial is when you know you made a mistake on day one with instructions to the jury, the jury should get the correction. But it wasn't done. And in the time of a trial, especially with a jury that's not used to the nuances and the court is, that's different. But to them, they're taking this as the law. They're taking the limited instruction verbatim. They're trying to apply it. They're trying to do what they have to do. They were misled. And that's my theme today is misled. The jury was misled. There are many, many cases where when you give a misleading jury instruction, and it could be just a phrase that it's been reversible error because a jury can be misled by that instruction and by what they're being told to do, the jury doesn't hear all truth. They don't hear all evidence that may be relevant. They hear what the rules allow them to hear. And we try to apply those rules so that we get a fair trial based on the values within our system of what's more important or less important, what's prejudicial or not prejudicial. In this instance, they were being told that they could not consider as evidence of the truth what Clyde Knowles told his attorney in attorney-client confidential communications about his planning of his will and the time he spent with him. That's what they were told. And if they applied that, that could lead to a different conclusion as to the weight of that testimony and the truthfulness of what was going on between him and his attorney and what he really intended in his will. With regard to the second part of our appeal is the matter of John Kessler. John Kessler's testimony was brought in because he passed away, but he had previously testified at a hearing on the will. And it was proven that some of his testimony was absolutely false. He claimed in his testimony that he went to high school with Clyde Knowles. One of the daughters testified, he hadn't gone to high school in the same high school. And that was basically admitted as an inconsistency. He didn't even go to the same high school that he thought he and Clyde knew each other from. But what I tried to introduce was that in his years of practicing, there was an 11-year time period where he had been disbarred both in Indiana and the state of Illinois from practicing law. The people on the jury were misled into believing that he had started practice in 1951 and continued through 2007. And as another witness testified, that he was from a prominent family, etc. So their impression of this attorney was different. And we didn't get to see the whole picture. Twenty percent of his possible legal career, he was disbarred for what? For taking money in the distributions from an estate. Something directly related to the concerns we had about what was going on here. Mr. Kessler didn't know what the assets of Clyde Knowles were, didn't know what the 2001 will was. And there was testimony that from Clyde to his attorney, Frank Weber, that he was taken because of something that Jim Knowles had put together for him to sign over in Kessler's office, which was the first affidavit. Then Jim Knowles took him the second time to that office to sign an affidavit, not even being able to reference the date or the exact will that was done the second time with Frank Weber. I mean, it's such a lack of credible circumstance here. And it fits real well with someone who was disbarred for 11 years in Indiana and Illinois. But we couldn't bring that in because the argument was it was remote, using the thought that criminal convictions that are more than 10 years old don't apply. I don't think we got a complete text. When he says he started in 1951, which was allowed in his evidence, in the essence of it, as I read the Applebee's brief, I see he's trying to apparently say that the rule that was presented to the court on the second day, and that we believe is the rule that has to be followed, came from the Special Committee on Rules, came from the Supreme Court. It's the rule of law that I think we have to follow. The only one that can change that is the Supreme Court. But I hear him say that in his brief, that what's in the rules that's in black and white was the mistake. And that the special advisor, Mr. Graham, in his book made a mistake. They forgot about some case law that's 100 years old, 108 years old, that really applies here. I'm mystified. If counsel thought that the Supreme Court rule adopted and became effective in 2011, and that the treatises on this subject matter are wrong, we should probably be to the Supreme Court asking them to rethink their rule and what it is. But this rule isn't just in Illinois. The committee reports even refer to North Carolina saying they have the same rule and saying that this is a change where you can take testimony from a decedent as proof of whether or not something's true. And I read with some interest in preparing for today how well, if that's the way, and if we just totally ignore the state of mind hearsay rule, then we can have people say that the earth is flat when it's round and they can say things like, well, you can make gold out of brass. Or I particularly like the third one where he says that the testator believed that the Cubs would win the World Series and that we should put all our money in seats behind the third base dugout because I know my kids don't believe that they're going to win, but I do. Which, based on what's happened recently and the parade I attended, I think some things are possible that might otherwise be thought impossible when we're talking to someone who's planning their will. But my overall point is there was a golden opportunity for the court to just simply spend five minutes tell the jury, yesterday we got it wrong. And we've realized that the limited instruction where I told you yesterday specifically as to a blanket instruction as to all of Frank Weber's testimony, that that should be made by Clyde Knowles as proof of those statements as to their proof of something of that nature, I was wrong in explaining it. I can't for the life of me figure out, even after the four hour drive here this morning, why it is that there was a reluctance in the least on the part of the court not to go to the jurors and explain a mistake came yesterday, we're going to correct it today, and take care of it. As the People v. Taylor case did where they mistakenly put a slip opinion in with the exhibits that went into the jury room, it got corrected because the court took carefully reviewed with the jury that that should not be part of their consideration, that they shouldn't think that way, it shouldn't be anything that they should have to do with. I mean, the court not only specifically asked if I wanted that correction to be made, but when I said I think so, repeated and said I don't want to know if you think so, I want to know if you want it or you don't, and I said I do. That's very specific. I didn't feel like I had to come back to him a second time and say I still do. I don't think it's necessary. I think there's more to it. And to then say you're recalling your witness, but I'm not going to let you rehash yesterday, I took as an order, I took as a direction that I'm not going to let you put Frank Weber on the stand. I'm going to let you put him on the stand for what I refused to let him testify to yesterday, and we'll deal with that. And that was the window and the opportunity that I thought I had at that point in time to put before the jury, and I went as far as I could. But in the closing, in the closing, the inferences drawn that were pushed forward to this jury was that Frank Weber hadn't been totally truthful, that the sisters who were here today had not been totally truthful, and that somehow they were involved in their father's estate planning that went on, when in fact the sisters denied any knowledge of the estate planning that was taking place, and Frank Weber denied ever speaking to the sisters about that, that they only talked about the guardianship case, the order of protection case, the other matters that were going on. But they all got confused because there was some lack of telling them that what he said can be all listened to, you can take it for everything that comes with it, and add whatever weight or credibility you want to. But the limiting instruction said you cannot take what is related to Mr. Weber by Mr. Knowles as being actual evidence of the truth of those statements. That's a powerful limiting instruction. Thank you very much. You will have rebuttal. Mr. Ray. Thank you, Your Honor. Your Honors. Counsel. I want it known that Joe Madden sent me a handwritten note thanking me for the incentive given to the Cubs by writing that in that brief. So, I think the, let's talk about the Kessler issue. He didn't get major year though. Yeah, but he should have. The Kessler thing I think is pretty easy to talk about, and let me just say this. First of all, you have no authority cited to you. I think that's significant. Counsel has conceded, as he must, that there are rules of evidence to balance what might be relevant evidence against other considerations like prejudice, etc. The applicable rule of balance here is from Rule 609 that says that if you have an impeachment based on unrelated bad conduct, criminal conviction, you have a 10-year limit. And I don't know how more clearly you or the trial court could properly assess whether the age of what had happened to Mr. Kessler was or was not admissible as against the balancing of prejudice, etc. It's right there in the rules of evidence. So, let's talk about Rule of Evidence 8033A. I think it's actually an unusual situation in a lot of different ways. Do I think that Professor Graham didn't really get it quite right? Actually, I do think he did not get it quite right. But the rule says what it says. And I think what you need to do, if I may suggest, is find a way to reconcile Rule 602 with this rule, which says that no person had the foundation of personal knowledge. Now, if you take that as a starting premise for pretty much anything any witness says, then how do you get to the point that a person, a declarant, who at least in the case of Will Contest by definition isn't here, knew as a fact had the foundation to have the personal knowledge to make the statement as to what his belief was if that can be proof of the truth of the fact believed. And that's why I gave you those examples in the brief about what a testator may well declare to be his belief, and to accept that as truth I think is simply wrong. And I think that what you can do to reconcile what I'm telling you, I think Professor Graham has it come back to something that was actually the genesis of this North Carolina connection. If you look at the committee comments, there aren't very many interestingly to the Rules of Evidence, but one of them is this very rule. But it doesn't have to do with the Will Exception. Several decades ago, you'll see in the committee comments, the appellate court accepted the view of the Supreme Court of North Carolina that in order to bring in a state of mind exception to the hearsay rule, you had to show the unavailability of the witness, and you had to show that there was a reasonable probability that the declarant knew what he was talking about. Interestingly, that kind of brings back in 602 that I just mentioned, doesn't it? Professor Graham, in all of his additions after that ruling came out, and the Illinois Supreme Court did follow that ruling in 1982. It's all in the committee comments. He criticized that greatly, saying that shouldn't be part of it. Because if you ask the trial court to assess the reasonable probability that the declarant knew what he was talking about, you're substituting the trial judge as a decision maker on the credibility of a witness, who by the way is not testifying in front of him, and that should be the jury's decision. So the judge shouldn't do that. And yet we do have Rules of Evidence that talk about this very topic. The trial judge does have a gatekeeper rule to decide whether that witness has enough personal knowledge. You have to, as the proponent of the witness, lay the foundation that he does. And if you don't, the trial judge should, under 602, say you can't testify any further on that particular topic. So if you look then at the committee rule, or committee comments, you'll see that they don't talk about this will exception to the exclusion to the exception. They only talk about the reasonable probability thing. Now I went back to the federal rule, which actually is very similar but not identical to the Illinois rule, 8033, and it refers to validity or terms of the declarant's will instead of the somewhat longer language in the Illinois rule. And their committee comments from 1972 talk about McCormick as supporting the view that there's some resting on practical grounds of necessity and expedience rather than logic, a reason to accept EXCPT. The allowance of a declarant to say what a testator's will was. Now, let me go off in a little bit different direction. Mr. Roth claimed to the trial judge that Frank Weber could say anything about anything. That because the attorney-client privilege is waived in will contest litigation, and we always agreed it was, that somehow opens up Mr. Weber's testimony to anything. My position was and is, and I think properly is, that's not true. Frank Weber could only testify to what he could properly testify to as any other witness. The privilege was removed. That's it. And that's how we then get to the issue of state-of-mind exception and where that came from. You will have noticed, I think, in the written presentations as well as Mr. Roth's comment this morning, he has failed to identify a single question that he either did not get a chance to ask Frank Weber on the second day or that he wanted to have the chance to ask Frank Weber on the second day. He has waived this issue. The idea that the trial judge says to you, well, do you want this perceived incorrect limiting instruction given? Yeah, I think I do. Well, yes, I do. All right. What do you want me to say? That's not the judge's proponent of anybody's case. He is supposed to be neutral. And part of the problem is... Let me ask you, counsel, when the attorneys make final arguments in the jury, what were their arguments as far as characterizing Weber's testimony as to the first day versus the second day? Were the arguments in the jury state-of-mind or you decide to be true or not true? I don't believe that those topics came up in final arguments. At all? At all. Now, the credibility of Mr. Roth... I would think, and we don't all have access to the record yet, we will have eventually, that Weber's testimony would have been argued as to what he said and what the significance of it was. There was no limitation. I mean, in other words, Mr. Roth had every opportunity to argue what he wanted. My argument... Okay, so the argument was made to the jury, Weber said that one of the sons took him to Kessler's office to sign a new will that the son either had directed Kessler to prepare in advance or took him there for the reason of making sure that he signed that will that abrogated the prize will. That argument was made to the jury as truthfully in fact of what occurred. Well, I don't know that that was articulated as a distinct point, but it was certainly argued and there was no objection from my end that no, you can't argue about that. What I argued about Frank Weber... Okay, just to make sure. So the jury, if it decided to, could have believed that that factually did take place? Based on the rulings of the court, absolutely. Okay. I'm sorry to interrupt you. Please go ahead. Now, just to finish the thought on Frank Weber, to my view, the evidence was that the girls had no conversations whatsoever, according to both them and Frank Weber about the will, and yet they called Frank Weber as dad was dying and after he died. A year and a half after they last had contact with Frank Weber. That permits me the inference, which I took, that you shouldn't believe that these women didn't talk to Frank Weber about the will or their dad, who they denied talking to the will about. Why would they have called Frank Weber if they didn't know? I think it's a very legitimate inference and that's where the credibility issue came in, as far as I was concerned. Because Frank Weber was out of the picture by July of 2007. Dad died on December 25, 2008. One of the two women called Frank a day or two before and after. They couldn't explain why... Yeah, but Weber still had a will that could have been admitted as the last will. Well, of course, but they denied knowing it. So my point is, why would you call him if you claim you didn't know he had a will? You claim you knew nothing about it. So, anyway... In the interchange with counsel in the court on the morning of the second day of trial, the question came up, well, how do we address the, I'll call it undoing, which was the phrase from the judge, the term from the judge, of this limiting instruction? And I suggested that when testimony is presented through Frank Weber this morning, actually it ended up being in the afternoon, that you want some other ruling than you got yesterday, ask for it. Or I'll object and it'll get overruled, which I did. To the extent that that ruling was wrong, it was corrected implicitly at least by the judge overruling my objections when Frank Weber testified the second time. That's a pretty good communication to the jury that the judge's ruling yesterday isn't being agreed with today because yesterday my objections were sustained, basically. So, I think to the extent the court had an opportunity presented by counsel to correct the ruling, he effectively did by overruling my objections, which of course I had to make to preserve my record. So, I come back to what question, what even single question, did Mr. Roth not get to ask Mr. Weber that he wanted to on the second day? If there was one, why didn't he make an offer of proof if he wanted it and was denied it? He did none of these things. I think you have to find waiver as a certainty. I don't think there's been any real argument this morning from Mr. Roth about manifest way to the evidence. I do just simply want to point out that in the briefs that have been filed, I think the statement of facts that we presented was considerably more detailed, addressed all of the witnesses that testified instead of just a select few. There was certainly a lot of uncertainty in what was going on, I think, in Clyde Knoll's mind in the year 2007. He'd been diagnosed with Alzheimer's in 2006. He was on medication, or Aricept, already by 2006. He was having behavior problems in 2006. He was having enough behavior problems in 2007. Actually, also in 2006 that he was put on a medication to in effect control behavior, Seroquil, and another one, Arisperdal. He was diagnosed by the psychiatrist as being paranoid, which was defined as being delusional. Well, in addition to all that, there was a petition for guardianship. My question is, given all of what you just described, and the petition for guardianship, and the fact that he was seen as a psychiatrist, is it my understanding that no one ever questioned his competency to draft any of the documents before his court at this point that are an issue? That would be correct. And the problem, I guess both sides have, is if you accuse one document of that, how do you avoid accusing the other document that you like? So it's not an issue. This is not a competency case. And I don't think the evidence would support that. As is typical with folks with Alzheimer's, good days, bad days. Some days the behaviors were okay. Some days they weren't so okay. Some days the decision-making was good. Some days the short-term memory and decision-making was terrible. And so if you put that whole package together and you look at the document in question, which is a July 12, 2007 affidavits prepared by Mr. Kessler, the second Kessler document, the only connection to Jim Knowles is he drove his dad there. The cases are cited in the brief. That's, as a matter of law, not enough to raise undue influence. And that's, I think, where you come out at the end of the day in terms of the manifest weight issue. It's not even a manifest weight issue. I think I'd been entitled to a direct verdict based on that. So to me it goes the other way. Well, couldn't you argue there was some inference to be drawn from the fact that something caused him to change his mind between July 10, 2007 and July 12, 2007? I'm talking about the testator. Of course. He was changing his mind with regularity, apparently. And was he changing his mind of his own will or was he changing his mind because the girls or the boys or both or all four of them were helping him change his mind? That's quite a tussle for the jury to have figured out. And it could go either way. I argued to the jury the best proof of undue influence was out of the girls' activities, not the boys. I think there's some reasons for that and I intercalate them in the brief in the section on manifest weight. I'm not asking you to find Rule 8033A is wrong. I'm asking you to define it in terms of Rule 602 and the need to have some foundation that there's something about what the testator had a reason to believe that he would be permitted to testify in and of himself if he were lying. Remember, 803 is not the declarant is unavailable rule. It's the declarant may or may not be unavailable. Keep in mind, Rule 105 expressly contemplates limiting instructions are appropriate. And if you look at the cases cited, whether you want to follow 8033A in the way Mr. Roth does or not, it's clear that limiting instructions are appropriate with regard to the state of mind exception. The cases are cited. So, I think your biggest problem here is you have nothing from the appellant that identifies a particular question that the limiting instruction was given on that it should have been given on according to him. And the reason I have mentioned that is if you look at the exact language of 8033A and the exception to the exclusion to the exception, unless it relates to the execution, revocation, identification, or terms of declarant's will. So, what testimony from Frank Weber addressed any of those four topics that wasn't permitted in, that was asked to be put in without that limiting instruction. And one of the problems, I guess, is that there appear to be no authorities that tell this court or us what is the scope of the execution. Is it anything more than I signed a will? Is it also include I signed a will because? Is it also I signed a will because I believed? And so, without there being anything in this record for you to be able to articulate, yes, that falls within one of those four terms. I don't know how you can decide this case other than to affirm it. And he got in on the second day when he asked to get in. What is he complaining about? Thank you. Thank you, counsel. Any rebuttal? I think from listening to the questions today and the comments today, the court can appreciate that there were a lot of facts in this case. It was very fact rich. The fact is very clear that Frank Weber took days and weeks and drove out to the properties individually with the testator, with Clyde Knowles, who explained where he wanted everything. He drew up a detailed will. I think the facts are clear that the affidavit, specifically the one from July 12th, is very questionable in how it was put together and what it says. And it's when there is a question that's close that what the jury has instructed is more important than ever. This comment about I've yet to hear the question that the jury might have misinterpreted, or I'm yet to hear the question that you didn't get to ask. It's not about saying, well, you might have asked another question or two, or you might have done this or you might have done that. What we do know is the jury was not told the correct instruction on day one because the limited instruction should not have been applied. What we do know is that the court acknowledged that on day two. And what I heard today is he's not challenging the rule itself, which specifically says that that testimony can be allowed to prove what that testimony says happened or he believed. That's plain and clear. It says to prove what he's saying. It doesn't say you have to then take a look at state of mind in addition to it and try to reconcile the two. No, it says what this person says, as an exception to hearsay, can be taken as evidence of the truth of what he is saying he believed or what facts he's relating to his attorney. End of story. It doesn't have to be reconciled with anything. It only takes one call in a close big time game that can make a difference. It only takes one little element along the road to get him to the jury that can throw them off. He says one phone call made at about the time in 2008 when Clyde died is enough for an inference to argue to the jury that the sisters weren't telling the truth and Frank wasn't telling the truth when he said they never talked about the will before Clyde's death. And yes, yes, Frank Weber thought that his will was the last one. He even filed it after the death. There was competing probates as to whether it's the will from July 10th or whether it's the affidavit. That's why there was a hearing back in that time period. And that's why there was testimony from John Kessler, which proved incredible on major elements of it. But the point is what we do know is we didn't give the jury the right instruction. And we do know it was a mistake. And we do know that it could have been corrected. The court could have corrected it and we wouldn't be here today. And there may very well have been a different result. I've had indirect interviews with the jury. I can't talk about that. But I know that this issue is important and would be important to a jury. And we have to assume that they're going to follow whatever instructions we give them. That's the only thing we can say. We can't say, well, by implicit thinking, the jury can assume that since day two you got to ask more questions that were sustained on objection on day one that the jury would then know that they can consider everything from day one without the limited instruction. I would say that's craziness. It's not for us to presume that they're going to piece together because he got to testify to a question on day one that there was a sustained that that therefore means we can consider everything in day one. No, that's way far out, way far beyond anything that we can do to presume what a jury is doing or implicitly understanding based on this scenario. Thank you very much. Thank you, Mr. Roth. Thank you, Mr. Ray. The case is submitted. The court stands in recess until after lunch.